**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:25-CV-746**

CYNTHIA LEE, M.S.Ed; R.S. by and through her parent, C.S., *and on behalf of all others similarly situated*; D.C. by and through his parent, B.C., *and on behalf of all others similarly situated*; J.M. by and through his parent and guardian, C.M., *and on behalf of all others similarly situated*; and L.J. *by and through his parent and guardian,* C.J., *and on behalf of all others similarly situated*,

Plaintiffs,

v.

CUMBERLAND COUNTY BOARD OF EDUCATION; NORTH CAROLINA DEPARTMENT OF PUBLIC INSTRUCTION; AYANNA RICHARD in her individual capacity and in her official capacity as Cumberland County Schools' Executive Director of Exceptional Children Services; and SHANNON BOOTH, in her individual capacity and official capacity as Principal of Sherwood Park Elementary School,

Defendants.

**FIRST AMENDED COMPLAINT**

**CLASS ACTION**

TABLE OF CONTENTS

**I. NATURE OF THE ACTION** .......... 4

**II. THE PARTIES** .......... 9

**III. JURISDICTION AND VENUE** .......... 13

**IV. FACTUAL ALLEGATIONS** .......... 14

**A. The IDEA's Child Find Mandate** .......... 14

**B. Defendants knew that CCS's use of MTSS to delay or deny the evaluation of suspected children with disabilities violated federal and state law.** .......... 16

1. The Department of Education's 2011 Letter to State Special Education Directors .......... 16

2. The 2020 Complaint alleging NCDPI's failure to supervise its LEAs' compliance with IDEA .......... 17

3. The NCDPI found that it violated its supervisory obligations under IDEA's Child Find and Initial Evaluation mandates .......... 18

**C. The Minor Plaintiffs were subjected to CCS's unlawful practice of conditioning its provision of IDEA's evaluation procedures on their completion of its MTSS program and other arbitrary prerequisites** .......... 21

**D. Plaintiff Lee filed a formal complaint with NCDPI revealing CCS's unlawful policy of using MTSS and other arbitrary prerequisites to deny disabled children of their right to IDEA's evaluation procedures** .......... 28

**E. NCDPI issues its Final Report confirming all of the systemic violations and individual violations alleged in Ms. Lee's Complaint.** .......... 29

**F. CCS and the individual defendants retaliated against Plaintiff Lee for advocating for R.S., D.C. and J.M.'s right to evaluations and for filing a state complaint that revealed CCS's systemic violations of IDEA.** .......... 37

**G. Respondeat Superior** .......... 39

**V. CLASS ACTION ALLEGATIONS** .......... 40

**VI. PLAINTIFFS ARE NOT REQUIRED TO EXHAUST IDEA'S ADMINISTRATIVE REMEDIES TO BRING THIS ACTION FOR SYSTEMIC VIOLATIONS OF THE IDEA** .......... 44

**VII. CAUSES OF ACTION** .......... 45

FIRST CAUSE OF ACTION: SYSTEMIC AND INDIVIDUAL VIOLATIONS OF THE IDEA ........ 46

A. CCS's Systemic and Individual Violations of IDEA ........ 46

B. NCDPI's Violations of IDEA ........ 48

SECOND CAUSE OF ACTION: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT and 42 U.S.C. § 1983 ........ 51

THIRD CAUSE OF ACTION: RETALIATION IN VIOLATION OF IDEA, THE REHABILITATION ACT and THE PROTECTION FOR REPORTING IMPROPER GOVERNMENT ACTIVITIES ACT (N.C.G.S. § 126-84 et seq.) ........ 53

FOURTH CAUSE OF ACTION: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY ........ 57

FIFTH CAUSE OF ACTION: RETALIATION IN VIOLATION OF THE FIRST AMENDMENT (42 U.S.C. § 1983) ........ 59

SIXTH CAUSE OF ACTION: VIOLATION OF ARTICLE I, § 14 OF THE NORTH CAROLINA CONSTITUIION ........ 60

VIII. PRAYER FOR RELIEF ........ 61

A. Prayer as to the Minor Plaintiffs and the Class ........ 61

B. Prayer as to Plaintiff Cynthia Lee's Causes of Action ........ 63

## I. NATURE OF THE ACTION

1. During the 2024-2025 school year, Plaintiffs, R.S., D.C., and J.M.[1] were second-grade students in Sherwood Park Elementary School ("Sherwood") a public school within Cumberland County Schools' ("CCS") system. During that year and the preceding years, R.S., D.C., and J.M. exhibited significant delays and other clear indications of disabilities which should have prompted school personnel refer them as suspected children with a disability long before the 2024-2025 school year.

2. The referral of a suspected child with disabilities for IDEA's initial evaluations to determine whether the child is a "child with a disability" is the touchstone of the Individuals with Disabilities Education Act ("IDEA") and the parallel provisions of state law, which require state and local educational agencies to "identify, locate, and evaluate every child who may have a disability requiring special education services." Also known as IDEA's "Child Find" mandate, this obligation is triggered whenever a child exhibits signs of a disability that may require specialized instruction and related services. When a child is "referred" by a parent or school personnel as a suspected child with a disability, the referral triggers the IDEA's initial evaluation procedures,[2] through which the child is provided "a full and individual evaluation" to determine whether the child is a "child with a disability"; that is, whether the child has a disability that requires special education and related services. And the school must make this determination according to a strict timetable; within 90 days of a referral of a suspected child with disabilities.

[1] R.S., D.C., J.M. and L.J. are collectively referred to herein as "the Minor Plaintiffs"

[2] For purposes of this complaint, the phrase "initial evaluation procedures" refers to the procedures set out in 34 C.F.R. §§ 300.300 -300.306.

3. When Plaintiff Cynthia Lee engaged with R.S., D.C. and J.M. as their second-grade teacher, she quickly concluded that each of them exhibited clear indications of disabilities that entitled them to special education and related services. Ms. Lee referred each of them to school administrators as a suspected child with a disability. So, too, did each child's parents. These referrals triggered CCS's obligation to conduct IDEA's initial evaluation procedures for R.S., D.C., and J.M.

4. IDEA's initial evaluation procedures require a "full and individual" educational assessment, using a variety of tools and strategies to evaluate a child in all areas related to a suspected disability. This includes examining health, vision, hearing, social and emotional status, general intelligence, academic performance, communication, and motor abilities. The results of these evaluations are then used to determine if the child has a disability, to identify their educational needs, and to develop an Individualized Education Program ("IEP") that prescribes the specialized instruction and related services that will be delivered to the child.

5. CCS refused to conduct IDEA's initial evaluation procedures for R.S., D.C. and J.M., despite referrals from their parents' and teacher. CCS also did not issue a written notice explaining why CCS disagreed with the referrals of any of the children as suspected children with disabilities. This was not an accident or oversight. This was a matter of CCS policy and practice.

6. CCS has long followed a policy of systematically delaying or denying its obligation to complete IDEA's initial evaluation procedures within 90 days by requiring all suspected children with disabilities to first exhaust CCS's Multi-Tiered System of Support ("MTSS") program.

7. MTSS is a "Response to Intervention" ("RtI") program that typically takes a year or more to exhaust and is implemented by a Student Services Team ("SST"). However, the IDEA forbids SEAs and LEAs from using an RtI strategy to delay or deny the IDEA's initial evaluation procedures.[3]

8. Further, CCS's policy is to ignore any written referral of a suspected child with a disability made anyone other than the SST and the SST cannot make a referral of any child until the child completes CCS's full MTSS process. The IDEA forbids this practice as well; IDEA expressly provides that a valid referral may be made by a parent or teacher.

9. At the end of the school year that began with Ms. Lee's referral of R.S., D.C. and J.M., Ms. Lee renewed her referral of them as suspected children with disabilities after she followed the requirements of the administration and the children's SST, including ensuring that all three students completed the three tiers of the MTSS process. Yet, CCS again refused to discharge its obligation to refer the students to a team of professionals to prescribe and obtain evaluations of them to identify their educational needs. However, CCS advised Plaintiffs that any referrals for IDEA's initial evaluation procedures after February 28, 2025, would be placed on a "wait list" and would not be addressed until the following school year.

10. As a result of CCS's policy and practice of violating the IDEA's Child Find mandate, CCS deprived the Minor Plaintiffs of their federal right to full, individual evaluations to identify their educational needs and develop an individualized education plan that provides the specialized instruction and related services necessary to meet those needs.

---

[3] *See, e.g.*, Exhibit 1, U.S. Department of Education Office of Special Education and Rehabilitation Services, *A Response to Intervention (RtI) Process Cannot Be Used to Delay or Deny an Evaluation for Eligibility under the IDEA*, OSEP 11-07, January 21, 2011.

This deprivation began prior to the beginning of the 2024-2025 school year and continues into this 2025-2026 school year.

11. Ms. Lee exhausted CCS's unlawful prerequisites for an actionable referral of R.S., D.C. and J.M. as suspected children with disabilities; nonetheless, after the prerequisites were completed, Ms. Lee requested R.S., D.C. and J.M. to be referred to the Exceptional Children ("EC") department for a possible evaluation, her request was refused by CCS again. Ms. Lee therefore filed a formal complaint with the North Carolina Department of Public Instruction, ("NCDPI") alleging that CCS's use of MTSS as a prerequisite to an actionable referral of a suspected child with a disability violated the IDEA's Child Find requirements in three ways. CCS's specific violations of IDEA – all systemic violations – were (1) violations of the IDEA's Child Find requirements; (2) violations of IDEA's requirement of timely and appropriate referrals for educational evaluation; and (3) violations of the IDEA's detailed evaluation procedures.

12. Within days of learning of Ms. Lee's complaint to the NCDPI, the individual defendants retaliated against her through abusive conduct, false accusations, public humiliation, and intimidation, forcing Ms. Lee to resign her employment at Sherwood Park Elementary School. Since then, Ms. Lee applied for other advertised positions within CCS for which she was highly qualified. CCS continued its retaliation by refusing to interview or hire her for the positions she was highly qualified. CCS did so in violation of its own Policy Manual, which provides, "All qualified applicants shall be considered for each vacant position. When several applicants for the same position are equally qualified and suitable for the position, employees within the school system will be given priority." *Id.* § 7100. Ms. Lee

was within the school system when she applied for the two positions; yet was not given priority in any way.

13. On July 25, 2025, NCDPI issued the report of its investigation of Ms. Lee's complaint (**Exhibit 5**). Among other things, NCDPI found that CCS policy and practice of using the MTSS to delay or avoid its obligations under IDEA violated the IDEA in all three ways that Ms. Lee alleged in her complaint. Relevant to the Class Action allegations, NCDPI found that all three of CCS's violations were "systemic" violations. A systemic violation of the IDEA arises when a school district has a policy, practice, or procedure that is applicable to a particular group or category or similarly situated children.

14. CCS did not appeal any of NCDPI's findings. However, CCS failed to comply with the specific remedial measures NCDPI ordered CCS to take with respect to the evaluation of R.S., D.C. and J.M.

15. NCDPI also ordered CCS to take several steps to address the likelihood that, because CCS's systemic violations were the product of policy, "other children who are part of the class, category, or similarly situated children" were also deprived of their same rights as R.S., D.C. and J.M. in the same ways. Among other things, NCDPI ordered CCS to produce a document identifying all such similarly situates children.

16. Plaintiffs bring this case as a class action under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, North Carolina's Protection for Reporting Improper Government Activities, 42 U.S.C. § 1983, and the common law of North Carolina.

## II. THE PARTIES

17. Plaintiff Cynthia Lee is and was at all times relevant to this action a citizen and resident of Cumberland County, North Carolina, employed by CCS and NCDPI. Ms. Lee taught Plaintiffs R.S., D.C. and J.M. at Sherwood Park Elementary School ("Sherwood"). Ms. Lee has a Bachelor of Science degree in Social Psychology and a Master of Science degree in education with an emphasis in Special Education. Prior to moving to North Carolina seven years ago, Ms. Lee was a licensed special education teacher in Virginia and taught special education students for over fifteen years. Her tenure as a special education teacher in Virginia gave her knowledge of the Child Find process and laws that govern it. In total, she has been in the field of education for over twenty-five years. Upon her arrival to North Carolina, Ms. Lee was employed by CCS as a general education teacher; however, she is licensed in North Carolina to teach both special education and general education students. Ms. Lee worked as a second-grade general education teacher at Sherwood. J.M., D.C., and R.S., were students in her second-grade class during the 2024-2025 school year.

18. Plaintiff R.S. is and was at all times relevant to this complaint a citizen and resident of Cumberland County, North Carolina, enrolled as a student in Cumberland County Schools at Sherwood, who, by reason of his disabilities, required special education and related services under the IDEA. No later than August 2024, R.S. was referred to Sherwood and CCS as a child suspected of having disabilities entitling her to special education and related services. R.S., a minor, is appearing in this case by and through her guardian, C.S.

19. Plaintiff D.C. is and was at all times relevant to this complaint a citizen and resident of Cumberland County, North Carolina, enrolled as a student in Cumberland County

Schools at Sherwood, who, by reason of his disabilities, required special education and related services under the IDEA. No later than August 2024, D.C. was referred to Sherwood and CCS as a child suspected of having disabilities entitling him to IDEA's initial evaluation procedures. D.C., a minor, is appearing in this case by and through his parent, B.C.

20. Plaintiff J.M. is and was at all times relevant to this complaint a citizen and resident of Cumberland County, North Carolina, enrolled as a student in Cumberland County Schools at Sherwood, who, by reason of his disabilities, required special education and related services under the IDEA. No later than August 2024, J.M. was referred to Sherwood and CCS as a child suspected of having disabilities entitling him to IDEA's initial evaluation procedures. J.M., a minor, is appearing in this case by and through his parent, C.M.

21. Plaintiff L.J. is and was at all times relevant to this complaint a citizen and resident of Cumberland County, North Carolina, enrolled as a student in Cumberland County Schools at Baldwin Elementary, who, by reason of his disabilities, required special education and related services under the IDEA. On multiple occasions, beginning in the 2023-24 school year, L.J.'s parent referred him to CCS as a child suspected of having disabilities entitling him to IDEA's initial evaluation procedures. L.J., a minor, is appearing in this case by and through his parent, C.J.

22. Defendant North Carolina Department of Public Instruction, ("NCDPI") is a North Carolina governmental entity organized and operating under the laws of the State of North Carolina and a recipient of federal funds. NCDPI is a "State Educational Agency" or "SEA" as that phrase is used in the IDEA. NCDPI operates and controls its Exceptional Children Division, established, in part, to ensure that all North Carolina public schools

comply with the federal and state laws governing the evaluation, identification and education of children with disabilities. NCDPI is a State Educational Agency ("SEA") subject to the IDEA and the parallel provisions of state law; and a "recipient" of "federal financial assistance" and operates a "program or activity receiving federal financial assistance" subject to Section 504 of the Rehabilitation Act and the regulations promulgated thereunder, 45 C.F.R. §§ 84.1, 84.1.

23. Defendant Cumberland County Schools ("CCS") is a North Carolina educational agency and a Local Educational Agency as that phrase is used in the IDEA, headquartered and conducting business through local schools in Cumberland County, North Carolina, including Sherwood Pines Elementary Schools. CCS is a Local Educational Agency ("LEA") subject to the IDEA and the parallel provisions of state law; and a "recipient" of "federal financial assistance" and operates a "program or activity receiving federal financial assistance" subject to Section 504 of the Rehabilitation Act and the regulations promulgated thereunder, 45 C.F.R. §§ 84.1, 84.1. CCS has waived its state law governmental immunity either by purchasing insurance or participating in a qualifying risk pool.

24. Defendant Carol Ann M. Hudgens, is and was at all times relevant to this action the Senior Director of the North Carolina Department of Public Instruction's Office of Exceptional Children ("OEC"). In that capacity, she was the official with final policymaking authority over the state's compliance with federal laws governing the

evaluation, identification and education of children with disabilities.[4] Defendant Hudgens is sued in her official capacity.

25. Defendant Ayanna Richard is and, at all relevant times, was CCS's Executive Director of Exceptional Children Services, responsible for ensuring that CCS complies with the laws governing the education of children with disabilities. In that capacity, Ms. Richard directed school principals and personnel to use the MTSS to delay the federally mandated evaluations of children suspected to have a disability to determine whether the child requires specialized instruction and related services to make meaningful educational progress. Defendant Richard is sued in her individual and official capacity.

26. Defendant Shannon Booth is and, at all times relevant to this action, was a citizen and resident of Cumberland County North Carolina employed by CCS as the Principal of Sherwood Park Elementary School ("Sherwood"). In that capacity, her responsibilities are to ensure that Sherwood complies with all laws governing the identification and education of children with disabilities enrolled there. Shannon Booth forced Sherwood teachers and staff to delay the evaluation of children suspected to have a disability by requiring that these children first complete the MTSS process, knowing that the process takes up to a year to complete. Shannon Booth also enforced the CCS policy and practice of ignoring all referrals of a child with a suspected disability unless the referral was made by the SST after completing the MTSS process. Shannon Booth is being sued in her individual and official capacity.

---

[4] Defendant Hudgens knew or should have known that the LEAs throughout North Carolina were not adhering to the Child Find laws as written in IDEA because NCDPI delegated to her the responsibility of ensuring that the use of RtI strategies do not delay or deny the evaluation of children who are suspected to have a disability that entitles them to special education and related services. She is being sued in her official capacity.

## III. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 28 U.S.C. § 1331 because it arises under the laws and constitution of the United States. Supplemental jurisdiction over plaintiffs' state law claims is conferred on this Court by 28 U.S.C. § 1367. Further, this action is ripe for adjudication by this court because the plaintiffs are seeking injunctive and monetary relief not available under the Individuals with Disabilities in Education Act ("IDEA"). *Luna Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023) ("the question is whether a plaintiff must exhaust administrative processes under IDEA that cannot supply what he seeks. And here, as in *Fry*, we answer in the negative."); *see also* discussion of factual allegations establishing exemption from exhaustion, *infra*, Section VI.

28. This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 12188(a)(1) in that all parties reside in this Judicial District and the matters at issue arose in this judicial district.

29. The Court has jurisdiction over the defendants because they engaged in the conduct giving rise to this action in North Carolina, the individual defendants reside in and work in North Carolina, and the entity defendants are North Carolina governmental agencies with their principal place of business in North Carolina.

30. Venue lies in this judicial district under 28 U.S.C. §1391 because the events which gave rise to this claim occurred here, all parties reside in or work in this Judicial District, and the matters at issue arose in this Judicial District.

## IV. FACTUAL ALLEGATIONS

### A. The IDEA's Child Find Mandate

31. The IDEA requires the North Carolina Department of Public Instruction and its constituent Local Educational Agencies ("LEAs") North Carolina public schools to locate, identify and evaluate all children with disabilities from birth through age 21. The Child Find mandate applies to all children who reside within a State, including children who attend private schools and public schools, highly mobile children, migrant children, homeless children, and children who are wards of the state. 20 U.S.C. § 1412(a)(3).

32. This includes all children who are suspected of having a disability Children who are suspected of being a child with a disability under 34 CFR § 300.8 and in need of special education, even though they are advancing from grade to grade; and (2) highly mobile children, including migrant children. 34 CFR § 300.111(c)

33. Parents or school personnel who suspect a child has a disability may refer the child for special education by providing a written referral to a school administrator or teacher that states the reason for the referral and addresses his or her specific concerns and the child's current strengths and needs. N.C. Gen. Stat. § 1503-2.1. If an oral request is made by the parent, the school shall assist the parent in completing a written referral. N.C. Gen. Stat. § 1503-2.2(b).

34. Upon receipt of a written referral, the school has 90 calendar days to complete the following:

a. The school must convene an IEP referral meeting to determine whether the child may be a child who is eligible for special education and related services;

b. If the child may be eligible for special education and related services, the school must ensure that the child receives a comprehensive evaluation in all suspected areas of a disability, including functional academic and developmental.

c. The school must provide the child's parents with a copy of the reports of all evaluations before the IEP meeting to determine if the child is "a child with a disability" under IDEA;

d. The school must have held an IEP meeting that included the parent(s) to determine if the child is "a child with a disability" based on the comprehensive evaluation of the child; and

e. If the child is determined to be "a child with a disability," the school must complete a written IEP that prescribes the specialized instruction and related services to be provided to the child.

35. The 90-day window to complete these things following a referral cannot be extended, even if the school and parents agree to extend it. N.C. Gen. Stat. § 1503-2.2(c)

## B. Defendants knew that CCS's use of MTSS to delay or deny the evaluation of suspected children with disabilities violated federal and state law.

### *1. The Department of Education's 2011 Letter to State Special Education Directors*

36. Defendants knew or should have known that the Response to Intervention ("RtI"), Student Services Team ("SST"), and Multi-Tiered System of Support ("MTSS"), process cannot be used to delay or deny the initial evaluations required by the IDEA within 90 days of a referral of a suspected child with a disability.

37. On January 11, 2011, the Department of Education Office of Special Education Programs issued a letter to all State Directors of Special Education, entitled, *A Response to Intervention ("RtI") Process Cannot Be Used to Delay or Deny an Evaluation for Eligibility under the Individuals with Disabilities Education Act ("IDEA")*."

38. A true and accurate copy of the 2011 OSEP Letter is annexed hereto as **<u>Exhibit 1.</u>** The letter states, in relevant part:

> OSEP has heard that some LEAs may be using RtI to delay or deny a timely initial evaluation to determine if a child is a child with a disability and, therefore, eligible for special education and related services pursuant to an individualized education program . . . . The regulations at 34 CFR § 300.301(b) allow a parent to request an initial evaluation at any time to determine if a child is a child with a disability. *The use of RtI strategies cannot be used to delay or deny the provision of a full and individual evaluation, pursuant to 34 CFR §§ 300.304-300.311, to a child suspected of having a disability under 34 CFR § 300.8.*
>
> The regulations at 34 CFR § 300.301(b) allow a parent to request an initial evaluation at any time to determine if a child is a child with a disability. If the LEA agrees with a parent who refers their child for evaluation that the child may be a child who is eligible for special education and related services, the LEA must evaluate the child. . . . If the LEA does not suspect that the child has a disability, and denies the request for an initial evaluation, the LEA must provide written notice to parents explaining why the public agency refuses to conduct an initial evaluation and the information that was used as the basis for

> this decision. 34 CFR § 300.503(a) and (b). The parent can challenge this decision by requesting a due process hearing under 34 CFR § 300.507 or filing a State complaint under 34 CFR § 300.153 to resolve the dispute regarding the child's need for an evaluation.

39. Thus, no later than January 11, 2011, it was clearly established that it is unlawful to require children suspected of having a disability to exhaust an RtI Process, like MTSS, before providing the child a full and individual evaluation to determine whether they have a disability that requires specialized instruction and related services.

2. *The 2020 Complaint alleging NCDPI's failure to supervise its LEAs' compliance with IDEA*

40. On September 28, 2020, Virginia Sharpless, on behalf of the non-profit organization, Literacy Moms, filed a formal Complaint with NCDPI ("the 2020 NCDPI Complaint"). A true and accurate copy of Literacy Moms' 2020 NCDPI Complaint is annexed as **Exhibit 2**.

41. The 2020 NCDPI Complaint documented evidence showing that many North Carolina LEAs were using an RtI process – the same Multi-Tiered System of Support ("MTSS") used by CCS -- to delay and deny the evaluation procedures that IDEA requires LEAs to conduct upon a referral of any suspected child with a disability. LEAs were doing so by requiring each child suspected as having a disability to first exhaust the multi-tiered MTSS process before evaluating the child to determine if s/he is a child with a disability in need of specialized instruction and related services.

42. MTSS is a comprehensive system comprised of the critical components of leadership, building capacity, implementation, infrastructure, communication and

collaboration, problem solving process, multiple tiers of instruction and intervention, and data/evaluation. Core (Tier 1) includes the instruction all students receive; Supplemental (Tier 2) includes additional instruction or intervention provided to students not meeting benchmarks; and Intensive (Tier 3) includes intense, small group or individual interventions for students showing significant barriers to learning the skills required for school success. Defendants used the RtI, SST, MTSS system to delay or deny students referred to CCS as suspected of having a disability from being referred to the EC department for further evaluation in order to determine whether the student was a child with a disability in need of an Individual Education Plan (IEP).

43. The complaint further alleged supervisory violations by the NCDPI on the grounds that NCDPI did not have adequate personnel or procedures in place to ensure that its LEAs complied with the IDEA's Child Find and evaluation requirements.

3. *The NCDPI found that it violated its supervisory obligations under IDEA's Child Find and Initial Evaluation mandates*

44. On November 25, 2020, NCDPI issued a Final Report on the 2020 Complaint finding itself in violation of the IDEA (the "2020 NCDPI Report").

45. A true and accurate copy of the 2020 NCDPI Report is annexed as **Exhibit 3**.

46. The 2020 NCDPI Report states, in relevant part:

f. "NCDPI is not in compliance with the whether the general supervision system of the SEA is aligned with the Individuals with Disabilities Education Improvement Act (IDEA), specifically, to ensure the policies

and procedures of a local education agency meet Child Find requirements"; and

g. "NCDPI is not in compliance" with the IDEA's requirement that "the SEA has policies and procedures in place to identify and correct noncompliance with Child Find, specifically the practice of requiring interventions through a multi-tiered system of support (MTSS) before a disability can be suspected."

47. The 2020 NCDPI Report also noted that:

a. in March 2017, its EC Division publicly posted a Decision-Making and Evaluation Guidance resource titled "SLD QuickStart Guidance Document", which contains the complete 2011 OSEP Memorandum, A Response to Intervention (RtI) Process Cannot Be Used to Delay-Deny an Evaluation for Eligibility under the Individuals with Disabilities Education Act, discussed above.

b. NCDPI had publicly posted comprehensive guidance for LEAs on the implementation of MTSS in their schools, called the MTSS LiveBinder, and that the LiveBinder expressly warns LEAs that "the use of RtI strategies cannot be used to delay or deny the provision of a full and individual evaluation pursuant to 34 CFR §§300.304-300.31, to a child suspected of having a disability under 34 CFR §300.8."

c. "There are no references within the LiveBinder items, focused on problem-solving, that indicated the team would routinely discuss whether or not a

disability was suspected and "no explicit sections that provide guidance on communication with families nor sample parent letters describing an MTSS or providing information regarding a parent's right to request an evaluation."

48. In the 2020 NCDPI Report, NCDPI imposed on itself a corrective action plan to be supervised by defendant Carol Ann M. Hudgens, who was then NCDPI's Section Chief for Policy, Monitoring and Audit. As such, Ms. Hudgens was and still is well aware of NCDPI's and the LEAs' noncompliance, and either knew or should have known of the virtually identical, ongoing violations CCS has committed here.

49. The corrective action plan included numerous requirements with deadlines to ensure LEAs cease the systemic use of MTSS to delay or deny provision of evaluations of suspected children with disabilities violations, including:

a. Between January 4, 2021, and June 30, 2021, NCDPI will deliver training to ensure that "all local education agencies fulfill the obligations documented in this Report";

b. On or before July 1, 2021, NCDPI "will collect a written assurance from each local education agency that affirms its completion of the required statewide technical assistance activities specific to this complaint"; and

c. "If an LEA is unable or refuses to complete the activities and provide the written assurance, the SEA will take further action."

50. Thus, no later than 2011, Defendants knew that the use of RtI strategies like MTSS cannot be used to delay or deny the provision of a full and individual evaluation

pursuant to 34 CFR §§ 300.304-311, to a child suspected of having a disability under 34 CFR § 300.8. Defendants were reminded that this practice was unlawful in NCDPI's guidance to LEAs on implementing MTSS programs. And, no later than July 1, 2011, Defendant CCS delivered written assurance to NCDPI that it discontinued the practice of using MTSS to delay or deny evaluations of suspected children with disabilities in its schools.

51. But CCS and the individual defendants did not discontinue the practice. To the contrary, they continued to aggressively enforce the unlawful requirement that no suspected child with a disability would be provided the full and individual evaluation procedures prescribed in 34 CFR §§ 300.304-300.31.

### C. The Minor Plaintiffs were subjected to CCS's unlawful practice of conditioning its provision of IDEA's initial evaluation procedures on completion of the MTSS program and other arbitrary prerequisites.

52. Throughout their enrollment in CCS schools, the Minor Plaintiffs and the Class were subjected to CCS's unlawful practice of using RtI strategies, like MTSS, and other arbitrary prerequisites to delay or deny their right to IDEA's initial evaluation procedures, thereby also delaying and denied their right to IDEA's specialized instruction, related services and an individualized educational plan designed to meet their unique educational needs.

53. Throughout her enrollment in CCS elementary schools, Plaintiff R.S. consistently demonstrated the need for specialized instruction and related services in school. She performed "well below benchmarks" in standardized reading assessment, struggles to put letter sounds together to decode unfamiliar words, and can read and comprehend text at a kindergarten level. She is unable to solve two-digit addition and subtraction problems, struggles to write her thoughts in a manner the reader can understand, and is easily distracted

by simple things such as lint on the carpet. She has been diagnosed with ADHD and was retained last school year in the second grade. She consistently demonstrated a need for specialized instruction and related services in reading, writing, behavior, and math. While enrolled in CCS, she consistently demonstrated evidence of a disability requiring specialized instruction and related services in reading, writing, behavior, and math.

54. Throughout his enrollment in CCS elementary schools, Plaintiff D.C. consistently demonstrated the need for specialized instruction and related services in school. He performed "well below benchmarks" in reading assessments. He struggles to decode words because he has difficulty putting letter sounds together. He is unable to accurately solve two-digit addition and subtraction problems. He struggles to independently write his thoughts in a manner that the reader can understand; He has poor grammar, sentence structure, capitalization and punctuation skills. While enrolled in CCS, he consistently demonstrated evidence of a Specific Learning Disability requiring specialized instruction and related services in reading, writing, and math.

55. Throughout his enrollment in CCS elementary schools, Plaintiff J.M. consistently demonstrated the need for specialized instruction and related services in school. He performed "below benchmarks" in reading assessments. When prompted to count in increments of 5 he responded "5, 10, 24." He struggles differentiating between the hour and minute hand on a clock; when prompted to say what time appeared on a clock showing 2:30, he responded 2:6. He is unable to read text on a level or above pre-primer; he struggles to write his thoughts in a manner that the reader can understand or write words legibly. He struggles to independently spell two and three letter words; and frequently rates words and

numbers backwards. He is unable to independently write simple sentences; and he is unable to accurately solve two-digit addition and subtraction problems. While enrolled in CCS, he consistently demonstrated evidence of a Specific Learning Disability requiring specialized instruction and related services in reading, writing and math.

56. Plaintiff L.J. was diagnosed with multiple disabilities that severely impeded his ability to access the general education curriculum. L.J.'s parent repeatedly expressed this to CCS and twice asked for L.J. to be evaluated to determine if he was entitled to an IEP; the first time when L.J. was in the first grade in the 2023-2024 school year, and again in the following school year. Both times, CCS responded that L.J. could not receive an initial evaluation until he was in third grade. When L.J. entered third grade he continued to struggle academically so his parent asked again if he could receive IDEA services. Again, CCS denied her request, this time CCS asserted that L.J. would not qualify for IDEA services. Each time C.J. referred L.J. to CCS as a suspected child with a disability, CCS failed to issue a written notice of its refusal to accept the referral or otherwise initiate IDEA's initial evaluation procedures. After Ms. Lee, R.S. D.C., and J.M. filed this lawsuit, C.J. enlisted Ms. Lee's assistance in CCS repeated refusal to initiate IDEA's evaluation procedures for L.J. CCS continued to refuse to initiate IDEA's initial evaluation procedures for L.J. But this time, CCS issued a written notice of its decision to deny L.J.'s referral for an initial evaluation. With that, on January 20, 2026, Ms. Lee and C.J. filed a petition for due process with North Carolina's Office of Administrative Hearings. On January 27, 2026, CCS agreed to implement the initial evaluation procedures for L.J.

57. The Minor Plaintiffs presented to CCS as suspected children with disabilities long before the 2024-2025 school year, but CCS did not provide them with IDEA's evaluation procedures because they had not exhausted the MTSS process.

58. Early in the 2024-2025 school year, R.S., DC, and J.M. were referred to CCS as suspected children with disabilities by their parents and by their teacher, Plaintiff Ms. Lee and their parents. L.J. was referred to CCS in 2023. Upon information and belief, the members of the class were also referred – or should have been referred – to CCS as suspected children with a disability.

59. CCS refused to initiate IDEA's evaluation procedures for any of them in response to the referrals because they had not yet exhausted the MTSS procedures.

60. Further, in response to the referrals, CCS never provided their parents with a written notice of CCS's decision to deny their child the IDEA's initial evaluation procedures, thereby preventing them from asserting their right under IDEA to challenge that decision through IDEA's due process procedures.

61. Plaintiff Cynthia Lee knew that CCS's policy of requiring children referred as suspected children with disabilities to exhaust all three tiers of CCS's MTSS process before initiating IDEA's evaluation procedures was unlawful.

62. Ms. Lee has a Bachelor of Science, degree in Social Psychology and a Master of Science, degree in education with an emphasis in Special Education. She was a licensed special education teacher in Virginia and taught special education students for over fifteen years prior to moving to North Carolina approximately seven years ago. Her tenure and training as a special education teacher in Virginia gave her knowledge of the Child Find

process and CCS's obligations upon the referral of suspected children with disabilities for IDEA's initial evaluation procedures.

63. Upon her arrival to North Carolina, Ms. Lee was employed by CCS as a general education teacher; however, she is licensed to teach both special education and general education students. In total, she has been in the field of education for over twenty-five years. Ms. Lee worked as a second-grade general education teacher at Sherwood Park Elementary School, (Sherwood), located in Cumberland County, North Carolina, during the 2023 - 2024 and 2024 – 2025 school years. J.M., D.C., R.S., were students in her class during the 2024 – 2025 school year.

64. In multiple faculty and staff meetings during the 2023-2024 and 2024- 2025 school years, Defendant Booth instructed faculty and staff that no one other than a student's SST could refer a student as a suspected child with a disability and that CCS would not provide any suspected child with a disability with IDEA's evaluation procedures until the student completed all three of the MTSS tiers. Defendant Shannon Booth advised faculty and staff that this was the policy of CCS and NDCPI and there were no exceptions.

65. Ms. Lee knew that LEAs were required to promptly provide IDEA's full evaluation procedures to children referred as a suspected child with a disability, and that parents and teachers can make a valid referral under IDEA, not just the SST. Ms. Lee also knew that completing all of the MTSS tiers required most, if not all, of the school year. Ms. Lee repeatedly advised her fellow teachers and the administrators enforcing this unlawful policy that the policy violated federal and state law.

66. Throughout the 2024-2025 school year, Ms. Lee continued to advocate for plaintiffs, insisting that they had been referred as suspected children with disabilities and were entitled to IDEA's full individual evaluation procedures. Ms. Lee questioned the SST concerning the MTSS process and on February 10, 2025, she asked Carol Duranceau, the SST coordinator, and to schedule an SST meeting for J.M. and his mother to review his completion of the MTSS. Ms. Duranceau became visibly angry and stated she was not going to schedule another SST meeting with J.M.'s mother because, she claimed, it was CCS's policy that students cannot be referred as a suspected child with a disability after February.

67. Undeterred, Ms. Lee requested a meeting with Shannon Booth and Carol Duranceau, the SST coordinator, to discuss the referrals of JM, DC and RS as suspected children with disabilities.

68. Ms. Lee questioned members of the SST about the new prohibition on referring suspected children with a disability after February. Some members of the SST became angered by Ms. Lee's advocacy and objections to CCS's unlawful policies. Sherwood's Assistant Principal Sandy Purcell, angrily confronted Ms. Lee and, in a raised voice, directed Ms. Lee not to speak to anyone on the SST except for her in the future.

69. Ms. Lee sent an email requesting a meeting with Shannon Booth, Sandy Purcell and Jackie White (Area Superintendent of School Support - Elementary), concerning Sandy Purcell's response to her concerns. The meeting convened on February 27, 2025, and consisted of the three administrators, Shannon Booth, Jackie White, and Sandy Purcell, verbally attacking her. Among other things, Shannon Booth told Ms. Lee that she had spoken to an attorney about filing defamation charges against Ms. Lee. During that same meeting,

Shannon Booth read from purported complaints alleging false statements concerning Ms. Lee.

70. Ms. Lee was flabbergasted because she had no idea that the letters had been written, and she thought that she was attending a meeting that she requested to speak about her concerns regarding CCS's unlawful policies.

71. Ms. Lee requested a copy of the complaints Ms. Booth purported to read from. Ms. Booth agreed to email them to Ms. Lee. But Ms. Booth never did.

72. On February 27, 2025, Carol Duranceau also met with Ms. Lee, Shannon Booth, and Jackie White, during which Ms. White asked Ms. Duranceau to schedule an SST meeting with J.M.'s mother. Ms. Duranceau denied this request for the same unlawful reasons she denied the same request made by Ms. Lee.

73. During a March 2025, faculty meeting, Shannon Booth condoned and ratified Carol Duranceau's instruction that no suspected children with disabilities will be provided IDEA's evaluation procedures after the end of February. She added that those students should continue to be referred to the SST and, if they complete the MTSS, they were to be placed on a "watch list" for consideration for evaluation the following school year. Ms. Lee knew this meant R.S., D.C., and J.M. would not be considered for evaluation until the 2025-2026 school year.

74. SST meetings were held for R.S., D.C., and J.M. in April 2025 and all three had completed tier 3 of the MTSS process. Nonetheless, Carol Duranceau told Ms. Lee and the students' parents that CCS would not initiate IDEA's evaluation procedures; instead, the

children would be put on a watchlist to be reviewed at some point in the following school year.

75. Ms. Lee told each parent to write a letter requesting that their child be referred to the EC department immediately. Additionally, she sent a detailed email to Wendy Nelson, (CCS EC Compliance Specialist), and told her that the CCS policies went against the Child Find laws. She also reminded Wendy Nelson that D.C.'s mother had made a referral of DC as a suspected child with a disability in September 2024 and repeated her belief that CCS was far out of compliance with IDEA and well past the mandatory 90-day timeline for completing IDEA's initial evaluation procedures.

76. At that point, Wendy Nelson arranged an IEP referral meeting for R.S., D.C., and J.M., D.C.'s meeting was first. During D.C.'s meeting she told Ms. Lee, and his parents that she didn't suspect that D.C. was a child with a disability, so she was not going to refer him to be evaluated. Shannon Booth concurred. D.C.'s mother began to cry, and she explained that she had tried to get help for D.C. since he was in kindergarten and no one would assist her to get the help that D.C. needed. Seeing how upset D.C.'s mother was, Ms. Lee asserted that this decision was to be made by the entire team.

### D. Plaintiff Lee filed a formal complaint with NCDPI revealing CCS's unlawful practice of using MTSS and other arbitrary prerequisites to deny disabled children of their right to IDEA's evaluation procedures.

77. Plaintiff Lee was concerned about all of the students who had been referred as suspected children with disabilities or should have been but were not as a result of other teachers' fears of retaliation for contradicting CCS's policy or otherwise explaining its unlawfulness.

78. On April 30, 2025, she filed a formal Complaint with NCDPI alleging CCS's systematic violations of IDEA's Child Find mandate and evaluation procedures, specifically detailing the violations as applied to JM, DC, and RS ("Plaintiff Lee's NCDPI Complaint")

79. A true and accurate copy of Plaintiff Lee's formal complaint is annexed as **Exhibit 4**

### E. NCDPI issues its Final Report confirming all of the systemic violations and individual violations alleged in Ms. Lee's Complaint.

80. On July 25, 2025, NCDPI issued its Final Report on its investigation of Plaintiff Lee's Complaint. A true and accurate copy of NCDPI's Final Report is annexed as **Exhibit 5**.

81. NCDPI's Final Report concluded that CCS violated JM, DC, and RS's rights under IDEA by failing or refusing to comply with IDEA's Child Find obligations, referral requirements, and evaluation procedures.

82. Further, NCDPI's Final Report concluded that these violations "systemic" violations arising out of CCS's unlawful "policies, practices, or procedures" for which corrective action "must involve all the other children who are part of the class, category, or similarly situated children."

83. NCDPI therefore ordered CCS to take the following "Individual Corrective Action" and "Systemic Corrective Action."

84. Individual Corrective Action as to JM, DC, and RS included that, no later than August 1, 2025, the EC administrator or designee will determine the status of the initial evaluation process for each of the three students and complete the following actions:

a. Provide the parents with a written document (notification) identifying both the dates of any assessments that were completed, (if any) and the list of assessments that still require completion.

b. The LEA shall expedite any assessments not currently completed and provide the parent with an anticipated timeline for completion.

c. Within two business days of this notification to the parents, the EC administrator shall provide the Corrective Action Coordinator and complaint investigator with a copy of each notification.

d. Prior to the 2025-2026 school year, The EC administrator or designee shall participate in an IEP team meeting for each of the three students, to review assessment results and determine eligibility. If the child is determined to be a child with a disability, an IEP shall be developed and upon written parental consent for services, the IEP must be in place prior to the first day of the upcoming school year.

e. Within five business days of the meetings, the EC administrator shall provide the complaint investigator and Corrective Action Coordinator with a copy of the IEP documentation, including the Eligibility Worksheets and eligibility determination, PWN, IEP Meeting Minutes; and if applicable, an IEP, and Consent for services. If an IEP is developed, and the parent provides written consent for services, the OEC will amend the corrective action requirement, as appropriate, to include:

f. Compensatory education services from the date of the respective parent's actual referral date, including any oral or written referrals made to complainant, or another staff member (less 90 days), through the date that an IEP is in place.

g. In the event there is a dispute between the parent and the LEA regarding the date each of the parents requested an evaluation, the period will be set by the complaint investigator based on the preponderance of the evidence; however, the period of time will not exceed a one-year period from the date the OEC received the complaint.

85. Relevant to the Class Action Allegations, NCDPI's "Systemic Corrective Action" included:

a. By August 8, 2025, the EC Administrator will coordinate the scheduling of in-person training with the OEC, by contacting Ms. Sara Self-Maddox, the OEC's IDEA Dispute Resolution Section Chief.

b. The preparation for the training includes CCS' review of its internal policies and procedures to determine whether CCS has current internal policies and procedures in place to address the areas identified as noncompliant in this report and listed below. The LEA will provide a copy of EC and Student Support policies and procedures that are relevant to the areas identified for training.

c. The OEC will provide in-person training, at a date to be determined by OEC and CCS, to ensure that all CCS' Exceptional Children's staff, and

CCS' Student Support staff are provided with training covering the following areas:

i. Federal Regulations and State Policies identified in this report, including: Child Find (34 CFR 300.111; and related obligations that ensure compliance with Child Find, found in 34 CFR §§ 300.309(c) and 300.311(a)(7)); Initial evaluations (34 CFR § 300.301; NC Policies: 1501-2.9 Child Find; 1503-2.2 Initial Evaluations; 1503-2.6 Additional Requirements for Evaluations; and any other relevant federal requirements or federal guidance; or State requirements or guidance as determined necessary by the OEC.

ii. Identification of any CCS practices, policies, or procedures relevant to this final report that are inconsistent with federal and/or State Policies; and in collaboration with the OEC (as determined by OEC Leadership), CCS shall establish an action plan to address any needed revision or development of LEA practices, policies, or procedures necessary to ensure compliance with federal and State requirements identified in this report.

iii. corrective action requirements and/or targeted program monitoring of CCS, based on the information obtained up until the corrective action tasks are completed, as identified in this report, including the LEA's action plan, and OEC's review and revision of any revised or new policies and procedures resulting from this

corrective action, as described above. Any additional requirements will be communicated by the OEC in writing. Within five days of completion of the OEC training, the EC Administrator or designee will submit to the Corrective Action Coordinator written confirmation that the required training has been completed, the date of the training, and a sign-in sheet listing the title of participants.

d. By August 12, 2025, the EC Administrator shall prepare a spreadsheet for the Corrective action coordinator and complaint investigator, using student ID numbers only, for all students that meet the criterion below, for the elementary school at issue in this complaint.

e. The spreadsheet shall include the data necessary to determine whether similarly situated students (as described above) during the 2024-2025 school year have been impacted by CCS's demonstrated practice that has resulted in violations of Child Find and Initial evaluations for students.

f. The data must include both the spreadsheet containing the data, and references to educational records, and other evidence used to complete the spreadsheet, and the information requested below:

    i. ECATS data need not be provided, as the OEC can access referenced IEP documentation located in ECATS.

    ii. Student Support Team (SST) roster of students for the 2024-2025 school year, including date referred to SST, and level of support.

iii. SST referrals to EC, (including any student referred by the parent or SST/LEA), during the 2024-2025 school year. Include the dates of participation, level of support by Tier, and date of referral to EC.

iv. Copies of written notifications to parents sent by CCS concerning planned or current screening, as described on CCS' website, as being referred to SST.

v. Written notification to parents regarding their child's participation in Tier II or Tier III interventions, whether or not the letter specifies the Tier.

vi. Summary Reports, including progress monitoring data, for identified students' participation in supplemental (Tier II or Tier III) interventions, including dates of participation (beginning and ending/current; dates of changes in Tiers; problem solving meeting notes; and any written communication to the parent regarding the child's participation in interventions).

vii. Whether the parent/guardian has requested an evaluation, including the date of that referral.

g. Additional actions may be necessary, including for any later identified child that should have been referred to EC, but was instead referred to SST without having opened a referral process.

h. Upon receipt of the information described above, the OEC will review the data collection spreadsheet and any corresponding evidence, to determine

whether additional student level or systemic-level corrective action is required. At the OEC's discretion, additional systemic-level corrective action may include changes to CCS policies and procedures, OEC targeted monitoring, and OEC provided technical assistance and training.

i. If the OEC determines that additional student-level corrective action is warranted, CCS will be responsible for notifying the parents of any similarly situated children of the resolution.

j. Evidence of corrections shall be submitted according to the due dates established. Any request to deviate from the required due date shall be communicated to the Corrective Action Coordinator and the complaint investigator via email.

86. CCS did not comply with the Individual Corrective Action Plan or Systemic Corrective Action Plan as mandated by NCDPI.

a. Regarding the Individual Corrective Action, CCS failed to comply with multiple requirements including, for example:

   i. CCS failed to provide JM, DC, and RS's parents with a written notification identifying the assessments each child will receive pursuing into IDEA's evaluation procedures by August 1, 2025.

   ii. CCS failed to expedite assessments for each child and provide the parent with an anticipated timeline for completion.

   iii. CCS failed to conduct an IEP team meeting for JM, DC, or RS for the start of the 2025-2026 school year

iv. CCS failed to ensure that an IEP for each child be in place prior to the first day of the 2025-2026 school year.

v. NCDPI has failed to amend the corrective action requirement to include competitor education services from the date of each parent's or C.L.'s referral of JM, DC, and RS as a suspected child with a disability.

b. CCS failed to comply with NCDPI's Systemic Corrective Action requirements. For example:

i. CCS failed to complete by August 8, 2025, the training detailed in in NCDPI's Report.

ii. CCS failed to comply with NCDPI's directive to remove from its internal policies and procedures all provisions that are inconsistent with IDEA's child find mandate, referral requirements, and evaluation procedures.

iii. CCS failed to timely and completely identify all similarly situated students that have been impacted by CCS's use of MTSS to delay or deny suspected children with disabilities of their right to IDEA's individual evaluation procedures.

iv. CCS failed to produce all notifications to parents regarding CCS's agreement or disagreement with a referral of a suspected child with a disability.

v. CCS failed to produce information describing all referrals of suspected children with disabilities.

### F. The Defendants retaliated against Plaintiff Lee for advocating for R.S., D.C. and J.M.'s right to evaluations and for filing a state complaint that revealed CCS's systemic violations of IDEA.

87. Upon learning of Plaintiff Lee's formal complaint to DPI, CCS, its agents and employees, including the individual defendants, retaliated against her.

88. On May 13, 2025, Defendant Ayonna Richard summoned Ms. Lee to a meeting where Defendant Richard openly expressed her outrage at Ms. Lee for filing her NCDPI Complaint. Defendant Richard insisted that students suspected of having a disability could not be evaluated to determine whether they are entitled to special education and related services until they completed the MTSS process and a referral for evaluations was made by the SST. In response, Ms. Lee explained that IDEA does not permit an LEA to use an RtI like MTSS to delay or deny a child IDEA's initial evaluation procedures upon a parent's or teacher's referral of a suspected child with a disability. This only angered Defendant Richard more.

89. On May 2, 2025, Defendant Shannon Booth and Assistant Principal Sandy Purcell joined the retaliation against Ms. Lee for filing her complaint when Sandy Purcell barged into Ms. Lee's class unannounced while she was helping students to complete their assignments and angrily took the students out of the room. Ms. Lee told Ms. Purcell she had prearranged this work with the students with the express approval of Shannon Booth. Ms. Purcell told Ms. Lee it was Defendant Booth who directed her to do remove the children from Ms. Lee's room.

90. The demeanor and conduct of Sandy Purcell and Shannon Booth were aggressive, angry and intimidating to Ms. Lee and, given the temporal proximity of this conduct to the filing Ms. Lee's complaint two days before, the conduct was clearly in retaliation against Ms. Lee for filing the NCDPI Complaint.

91. On May 16, 2025, Ms. Lee filed a formal Complaint with CCS Human Resources Department (HR), against Shannon Booth, Sandy Purcell, Carol Duranceau and Candace Locklear. In both complaints Ms. Lee alleged noncompliance of the laws that govern Child Find. Ms. Lee forwarded a copy of both formal Complaints to all members of CCS Board of Education and the individual staff members involved. Tonya Page, (CCS Director of Human Resources, who has since retired), was assigned to investigate Ms. Lee's Complaint. On May 16, 2025, Tonya Page called Ms. Lee., who answered expecting her to speak about her Complaint but instead, Tonya Page informed her that Carol Duranceau filed a formal Complaint against her on May 8, 2025, so she was calling to investigate Carol Duranceau's Complaint. Ms. Lee was not given a copy of the formal Complaint that Carol Duranceau wrote against her; nonetheless, she rebutted based on the conversation she had with Tonya Page.

92. On May 30, 2025, Shannon Booth berated Ms. Lee in front of the entire staff at the end of the school year luncheon. Speaking into a microphone to the assembled faculty and staff, Defendant Booth angrily complained that Ms. Lee filed a complaint against her during the school year and told the staff that Ms. Lee's complaints were going nowhere. Ms. Booth's rant was intended to humiliate and denigrate Ms. Lee in front of her professional community, in retaliation against Ms. Lee for her protected speech and conduct, and to

dissuade Ms. Lee and all of their colleagues in attendance from engaging in similar protected conduct in the future.

93. The hostile work environment the defendants created for Ms. Lee, at Sherwood, began with her advocacy for plaintiffs, and worsened after Ms. Lee continued to question the defendants' unlawful use of the MTSS process to delay and deny plaintiffs of their right to full evaluations, special education and related services under the IDEA, and became relentless after defendants learned that she had filed a complaint with NCDPI.

94. As a result of defendants' retaliatory conduct, Ms. Lee declined to return to Sherwood which meant that she would no longer be employed by CCS/NCDPI after June 30, 2025.

95. As a result of defendants' relentless retaliation, Ms. Lee was constructively discharged and suffered personal and professional humiliation, emotional distress, reputational harm, lost past and future income, lost earning capacity, and reputational harm. Moreover, because defendants' retaliatory conduct was accompanied by malice and willful and wanton conduct, Ms. Lee is entitled to punitive damages from each defendant.

**G. Respondeat Superior**

96. At all times relevant to this complaint, each Defendant knew or should have known the rules, regulations, policies and laws that govern the identification and evaluation and identification of children suspected of having disabilities requiring special education and related services. Each defendant knew or was deliberately indifferent to the fact that their systematic conduct and the policies and practices of CCS and Sherwood violated these mandates. The individual defendants were all acting within the course and scope of their

employment or agency with the entity defendants and, as such, the entity defendants are vicariously liable for the harms caused by their unlawful conduct, policies and practices by virtue of the doctrine of *respondeat superior* in addition to the custom and practice liability established by the facts alleged herein.

## V. CLASS ACTION ALLEGATIONS

97. The Minor Plaintiffs bring this action on behalf of themselves and on behalf of the following class (the "Class"):

> All children enrolled in North Carolina public schools who, during the six year period preceding the filing of this action, (1) were referred to their Local Educational Agency as suspected of having a disability requiring specialized instruction and related services; and (2) were not provided full and individualized evaluations according to the timeline and procedures prescribed by the IDEA for initial evaluations.

98. The members of the Class are so numerous that joinder of all members is impracticable. There are likely hundreds of class members who were enrolled in Cumberland County Schools during the claim period.

99. Plaintiffs' claims are typical of the claims of the members of the Class; it is unlikely that there will be material differences between plaintiffs' claims, set out in the First through Third Cause of Action below, and the claims of the members of the Class.

100. The losses to the Plaintiffs were caused by the same course of conduct that caused the losses to the members of the Class.

101. Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiff has no conflict of interest with other members of the Class. Plaintiffs have retained attorneys

who are highly experienced in the substantive law of this action, qualified to conduct class action litigation, and competent to assert the interests of the Class.

102. In this case, the members of the proposed class share a common injury caused by the unlawful use of RtI strategies, arbitrary prerequisites, and other means to delay or deny their right to IDEA's initial evaluation procedures. For each member, the injury is the same: they were denied their statutory right to IDEA's evaluation procedures, which, in turn, denied their right to specialized instruction and related services, delivered according to an Individualized Educational Program.

103. This injury is "capable of classwide resolution," because the Court can issue a single declaration finding that Defendants' use of any RtI strategy, arbitrary limitation, or any other means to delay or deny IDEA's initial evaluation procedures is a violation of IDEA.

104. The common questions of fact include:

a. After the class members were referred as a child with a suspected disability, were Plaintiffs required to exhaust an RtI strategy, including the MTSS process, before the LEA would provide the evaluations necessary to determine if they had a disability that required specialized instruction and related services?

b. Has CCS followed a policy or practice of using RtI strategies, arbitrary prerequisites and other means to delay or deny members of the class of their right to IDEA's evaluation procedures, and, if so, for how long?

c. Has CCS followed a policy or practice of refusing to accept referrals of suspected children with disabilities after a specific date during the school year?

d. What other restrictions or conditions did CCS and other LEAs impose to delay or deny their right to IDEA's initial evaluation procedures?

e. Did CCS issue a written notice to parents or guardians of referred children explaining the reasons for its decision not to initiate IDEA's initial evaluation procedures and informing them of how they can challenge the decision?

f. How long did class members wait after they are referred as a suspected child with a disability before their LEA complied with IDEA's evaluation procedures?

g. Did NCDPI violate its statutory obligation to ensure that its LEAs are not pursuing policies or practices that delay or deny a suspected child with a disability his or her right to IDEA's evaluation procedures within 90 days of his or her referral?

h. What processes and procedures has NCDPI implemented to ensure that LEAs are not using RtI strategies or other means to delay or deny referrals for IDEAs initial evaluation procedures?

i. What supervision or training has NCDPI given to personnel employed by its LEAs to ensure compliance with the requirement that they are not delaying or denying initial evaluations by requiring exhaustion of RtI procedures or other means?

105. The common questions of law are:

a. Did defendants' use of RtI strategies, arbitrary prerequisites or other means to delay or deprive the class members of their right to the initial evaluation procedures mandated by the IDEA upon a proper referral.

b. Did defendants' use of "referral deadlines" for referrals of a suspected child with a disability in a given school year violate IDEA's requirement that IDEA's evaluation procedures be completed within 90 days of a referral?

c. Are the class members entitled to declaratory and injunctive relief to remedy the defendants' systemic violations of law; and

d. Did the class members sustain compensable harms by reason of defendants' wrongful conduct and, if so, what is the proper remedy?

106. Resolution of these common issues will provide "a common answer to the crucial question," Wal-Mart, 564 U.S. at 352, and Rule 23(a)(2) is thus satisfied.

107. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

108. Class treatment also will permit the adjudication of relatively small claims by certain members of the Class who could not afford to litigate individually such claims against sizable corporate defendants.

109. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude maintenance as a class action.

## VI. PLAINTIFFS ARE NOT REQUIRED TO EXHAUST IDEA'S ADMINISTRATIVE REMEDIES TO BRING THIS ACTION FOR SYSTEMIC VIOLATIONS OF THE IDEA

110. The IDEA provides an administrative complaint procedure through which an individual child with a disability may seek compensatory education and reimbursement of private educational expenses resulting from an LEA's failure to provide the child with a free appropriate public education. 20 U.S.C. § 1415.

111. Plaintiffs are excused from exhausting the IDEA's due process procedures because exhaustion would be futile or inadequate. *Honig v. Doe*, 484 US 305, 327 (1988); *Smith v. Robinson*, 468 U. S. 992, 1014, n. 17 (1984) (citing cases). Since *Honig*, federal courts have consistently excused plaintiffs from exhausting § 1415(a)-(e) administrative remedies before bringing a civil action under §1415(e) where the plaintiff alleges systemic violations of the IDEA

112. Federal courts also consistently excuse plaintiffs from exhausting the IDEA's administrative remedies where the local or state educational agency is responsible for the plaintiff's failure or inability to exhaust administrative remedies. *See Quackenbush v. Johnson City School Dist.*, 716 F.2d 141, 147-48 (2d Cir.1983), *cert. denied*, 465 U.S. 1071 (1984) (allowing a § 1983 action for violation of the IDEA when the state was directly responsible for plaintiff's failure to exhaust administrative remedies); *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 634 (4th Cir.1985) (holding that an LEA's failure to comply with notice of denial of a parent request for IDEA services prevents a parent from bringing a viable due process complaint under the IDEA's state's administrative procedures); *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89 (3rd Cir. 1996).

113. In this action, the plaintiffs allege that the LEA prevented them from exhausting IDEAs remedies through the LEA's practice of requiring children referred as suspected of having a disability to exhaust PTI procedures like the MTSS – without issuing a notice that the LEA disagrees with the referral – prevents the child from initiating the administrative e due process procedures under § 1415.

114. Plaintiffs are also excused from exhausting administrative remedies under § 1415 "where they allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." See *Mrs. W. v. Tirozzi*, 832 F.2d 748, 756-57 (2d Cir.1987) (waiving IDEA exhaustion requirement for plaintiffs who challenged adequacy of state's complaint resolution procedures where plaintiffs alleged that violations were "unable to be addressed at the due process hearings provided in Connecticut" and that the hearing officer lacked the authority to provide system-wide relief).

115. Exhaustion is not required here because Plaintiffs allege that "an agency has adopted a policy or pursued a practice of general applicability that is contrary to law." 1985 H.R. No. 296, 99th Cong., 1st Sess. at 7 (1985) (the "1985 House Report"); *Jose P. v. Ambach*, 669 F.2d 865, 869-70 (2d Cir.1982) (exhaustion of administrative remedies not required in class action alleging systematic EHA[5] violations)

[5] The EHA, the Education of the Handicapped Act, was amended and renamed the Individuals with Disabilities Education Act (IDEA)

116. The systemic violations of law like those alleged in this action are "among traditionally respected bases for a waiver of § 1415's exhaustion requirement," any exhaustion requirement should be waived in this case.

117. Likewise, exhaustion should also be waived on the grounds that the defendants prevented the plaintiffs from pursuing administrative remedies by refusing to issue a written decision denying the referrals of plaintiffs as suspected children with disabilities.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### SYSTEMIC AND INDIVIDUAL VIOLATIONS OF THE IDEA

*The Minor Plaintiffs and the Class against CCS and NCDPI*

### A. CCS's Systemic and Individual Violations of IDEA

118. The foregoing allegations are incorporated by reference as though fully set forth here.

119. Defendant CCS is a "Local Educational Agency" ("LEA") as that phrase is used in IDEA and it is subject IDEA's requirements and the parallel provisions of state law.

120. Defendants CCS, Richard and Booth are "persons" as that term is used in 42 U.S.C. § 1983, and at all times relevant to this cause of action, they were acting under color of state law.

121. The Minor Plaintiffs and the Class Members were or should have been referred to their LEA as suspected children with disabilities and, as such, their LEA was required to initiate IDEA's evaluation procedures for them, but failed or refused to do so.

122. The Minor Plaintiffs and the Class Members were, in fact, children with disabilities, who, by reason of their disabilities were entitled to specialized instruction and related services prescribed in an Individual Education Program and delivered at no cost to them by NCDPI and CCS.

123. CCS unlawfully used an RtI strategy, arbitrary deadlines, minimum age requirements, and limits on recognized sources of referrals for initial evaluations (*i.e.*, recognizing referrals only from the SST team but not parents or other school personnel) to delay and deny the Minor Plaintiffs and the Class their right to the IDEA's initial evaluation procedures.

124. As a result of CCS's unlawful delay and denial of IDEA's initial evaluation procedures, CCS deprived the Minor Plaintiffs and the Class of their right to specialized instruction and related services prescribed in an IEP and delivered at no cost to them.

125. CCS also unlawfully failed or refused to deliver the required written notice to the parents of the Minor Plaintiffs and the Class explaining the decision not to initiate IDEA's initial evaluation procedures and the procedures available to challenge the decision.

126. Because the written notice of CCS's decision is required to challenge an LEA's decision through IDEA's due process procedures, CCS prevented the Minor Plaintiffs and Class Members from initiating IDEA's due process procedures to challenge CCS's unlawful denial their right to initial evaluations under IDEA.

127. As a result of the foregoing violations of the IDEA and parallel provisions of state law, the Minor Plaintiffs and the Class were deprived of a Free Appropriate Public Education guaranteed by IDEA, including but not limited to comprehensive initial

evaluations to determine their areas of need, an Individualized Education Program prescribing the specialized instruction, related services and supplementary aids and services they require to make meaningful educational progress.

128. As a direct and proximate result of these violations, The Minor Plaintiffs, and the Class Members have suffered and continue to suffer loss of educational services, loss of earning capacity, isolation and loss of social engagement, significant education achievement gaps, humiliation, anxiety, mental anguish, emotional distress, and damage to their reputation and personal relations.

129. As a result of these deprivations and harms, the Minor Plaintiffs and Class Members are entitled to prospective injunctive relief prohibiting the unlawful policy and practices CCS has used to delay and deny the right to IDEA's initial evaluations upon a proper referral. Further, the Minor Plaintiffs and the Class are entitled to all appropriate relief necessary to remedy CCS's violations, including but not limited to compensatory educational services.

**A. NCDPI's Violations of IDEA**

130. The foregoing allegations are incorporated by reference as though fully set forth here.

131. Defendant NCDPI is a "State Educational Agency" ("SEA") as that phrase is used in IDEA and it is subject to the requirements of IDEA and the parallel provisions of state law.

132. IDEA makes NCDPI responsible for establishing systems and procedures that will promptly detect and correct any systemic noncompliance with IDEA by one or more

LEAs or any State-wide patterns of noncompliance. 20 U.S.C. §§ 1412(a)(11) and 1435(a)(10); 34 C.F.R. §§ 300.149 and 303.120. When NCDPI identifies an LEA's noncompliance—whether through a single case or a systemic pattern—it is legally obligated to ensure it is completely corrected as soon as possible, and in no case later than one year after its written identification of the noncompliance. 34 CFR § 300.600(e).

133. On January 21, 2011, in a Dear Colleague Letter (**Exhibit 1**), the Department of Education warned NCDPI that that there was an emerging pattern among LEAs "to use Response to Intervention (RtI) strategies to delay or deny a timely initial evaluation for children suspected of having a disability" and that "the use of RtI strategies cannot be used to delay or deny the provision of a full and individual evaluation, pursuant to 34 CFR §§ 300.304-300.311, to a child suspected of having a disability under 34 CFR §300.8."

134. NCDPI did not discharge its obligation under IDEA to ensure that its LEAs were not denying or delaying the provision of full and individual evaluations to suspected children with disabilities by requiring exhaustion of RtI strategies, imposing arbitrary deadlines, minimum age requirements or other means.

135. As a result, CCS implemented policies or practices that used RtI strategies or other unlawful means to delay or deny IDEA's initial evaluation procedures to suspected children with disabilities.

136. On September 27, 2020, Virginia Sharpless filed a complaint against NCDPI (Exhibit 2) alleging that NCDPI was violating the IDEA by failing to have policies and procedures in place to identify LEAs that were requiring exhaustion RtI strategies or other

means to delay or deny IDEA's initial evaluation procedures to children referred as suspected disabilities.

137. On November 25, 2020, NCDPI concluded that it did not have policies and procedures in place to identify and correct LEAs that were engaging in these practices. NCDPI Report, Exhibit 3 at 12.

138. NCDPI was required to completely correct the failures of its policies and procedures within one year. 34 CFR § 300.600(e).

139. However, four years after that, Plaintiff Lee arrived at CCS to find that the district was not only categorically requiring a child to exhaust all three tiers of MTSS before considering a referral of the child for initial evaluations, it was also imposing an arbitrary annual cut-off date for any referral of a suspected child with a disability, categorically denying referrals of any child until the child was in third grade, and categorically denying the referral of any child unless it was made by the SST.

140. It is plainly obvious that, whatever corrective action NCDPI took to cure the defects in its policies and procedures in response to the Sharpless Complaint fell woefully short of IDEA's requirement that all noncompliance is corrected as soon as possible, and in no case later than **one year** after its written identification of the noncompliance. 34 CFR § 300.600(e).

141. NCDPI was completely unaware of CCS's practice of unlawfully delaying and denying IDEA's initial evaluation procedures until Ms. Lee filed her complaint on April 30, 2025.

142. And, while NCDPI imposed corrective measures on CCS, CCS failed to implement them completely or timely.

143. Over the course of fifteen years, NCDPI has consistently failed to establish policies and procedures that identify and correct its LEAs practice of using RtI strategies and other means to unlawfully delay and deny IDEA's initial evaluation procedures to suspected children with disabilities.

144. As a result, Plaintiffs respectfully request that the court order prospective injunctive relief robust enough to ensure disabled students in North Carolina are no longer subjected to unlawful delays and outright denials of their right IDEA's evaluation procedures.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
## and 42 U.S.C. § 1983

*The Minor Plaintiffs and the Class against NCDPI, CCS and Defendants Richard and Booth in their individual and official capacities*

145. The foregoing allegations are incorporated by reference as though fully set forth here.

146. Defendants CCS, NCDPI, Richard, and Booth are "persons" as that term is used in 42 U.S.C. § 1983.

147. At all times relevant to this cause of action, the Defendants named in this cause of action were acting under color of law.

148. NCDPI and CCS are "program[s] . . . receiving Federal financial assistance," and are therefore subject to the Rehabilitation Act of 1973. 29 U.S.C. § 794(a).

149. Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), and the regulations promulgated thereunder, 34 C.F.R. Part 104, prohibits discrimination against persons with disabilities, including the exclusion from the participation in, or being denied the benefits of, or being subjected to discrimination under any program or activity receiving Federal financial assistance.

150. The Minor Plaintiffs, and the Class Members have a disability as documented above.

151. The Minor Plaintiffs, and the Class Members are all otherwise qualified to participate in NCDPI's and CCS's educational programs, including their Child Find, referral and initial evaluation procedures.

152. Defendants excluded the Minor Plaintiffs and Class Members from these and other NCDPI and CCS programs solely by reason of their disabilities, in violation of Section 504.

153. In doing so, Defendants acted with bad faith or gross misjudgment. For example, despite knowing the clear evidence of the Minor Plaintiffs' and Class Members' disabilities and requests for educational evaluations made by parents and school personnel, the CCS Defendants refused to evaluate these children to identify their disabilities, educational needs, and the modifications and accommodations required to enable them to participate in and benefit from full and equal access to Defendants' public educational opportunities, programs, and services. In addition, the CCS Defendants' retaliatory actions in response to Ms. Lee's complaints of their ongoing violations of law offer another example of Defendants' bad faith and gross misjudgment. Likewise, NCDPI's ongoing failure to

establish procedures and policies to prevent CCS and other LEAs from open and obvious violation of federal disability law are another example of NCDPI's bad faith or gross misjudgment.

154. As a direct and proximate result of Defendants' violations of Section 504, THE MINOR PLAINTIFFS and the Class Members have suffered and continue to suffer loss of education, loss of earning capacity, isolation and loss of social engagement, significant education achievement gaps, humiliation, anxiety, mental anguish, emotional distress, and reputational harm.

155. As a result of these harms, the Minor Plaintiffs and Class Members are entitled to compensatory damages from CCS and they are entitled to prospective injunctive relief enjoining CCS and NCDPI from continuing to engage in the violations and preventing them from doing so in the future.

## THIRD CAUSE OF ACTION
## RETALIATION IN VIOLATION OF IDEA, THE REHABILITATION ACT and 42 U.S.C. § 1983; and THE PROTECTION FOR REPORTING IMPROPER GOVERNMENT ACTIVITIES ACT

*Cynthia Lee against CCS, NCDPI, and Defendants Richard and Booth in their individual and official capacities*

156. The foregoing allegations are incorporated by reference as though fully set forth here.

157. Defendants CCS, NCDPI, Richard, and Booth are "persons" as that term is used in 42 U.S.C. § 1983.

158. At all times relevant to this cause of action, the Defendants named in this cause of action were acting under color of law.

159. Cynthia Lee assiduously advocated for the right of the Minor Plaintiffs and Class Members to receive educational evaluations and educational services to which they were entitled under the IDEA and Rehabilitation Act, and against their unlawful exclusion from NCDPI's and CCS's educational programs and activities in violation of the IDEA and Rehabilitation Act.

160. This was protected activity under the IDEA, the Rehabilitation Act, and North Carolina's Protection for Reporting Improper Government Activities Act, N.C. Gen. Stat. §§ 126-84 *et seq.*[6]

161. Ms. Lee reported verbally and in writing to her supervisor, department head, and other appropriate authorities that CCS was engaging in systemic violations of federal and state law governing the identification and evaluation of children with disabilities enrolled in CCS's schools. Ms. Lee's reports included, for example, CCS's use of RtI strategies, arbitrary waiting periods and deadlines for referral, and refusal to recognize referrals of a suspected child with a disability unless it was made by the STS, to delay and deny the Minor Plaintiffs and Class Members of their right to educational evaluation procedures, specialized instruction, related services, supplemental aids and services to be prescribed in an IEP.

162. This was protected activity under the IDEA; Rehabilitation Act, and the Protection for Reporting Improper Government Activities Act, N.C. Gen. Stat. §§ 126-84 *et seq.*

[6] N.C.G.S. § 126-85 prohibits any state employee from retaliating against another employee because s/he "reports or is about to report, verbally or in writing, any activity described in G.S. 126-84." N.C.G.S. § 126-84(a)(1) imposes a duty on state employees to report to their supervisory employees any "violation of state or federal law, rule or regulation."

163. Ms. Lee filed a formal complaint with the NCDPI documenting CCS's systemic violations of federal and state law.

164. This was protected activity under the IDEA; Rehabilitation Act, and the Protection for Reporting Improper Government Activities Act, N.C. Gen. Stat. §§ 126-84 *et seq*.

165. As a direct and proximate result of Ms. Lee's protected activity, NCDPI, CCS, Richard and Booth, individually and in concert with each other and their employees, retaliated against Ms. Lee for engaging in the foregoing protected activity in the ways alleged above, including, for example: by creating a hostile environment within Sherwood, fabricating bogus complaints against Ms. Lee, making false and defamatory public statements concerning Ms. Lee and her protected activities, impugning her integrity and professionalism in front of her professional peers, by deliberately subjecting Ms. Lee to public humiliation, ridicule and emotional distress on a daily basis, and by threatening and otherwise discriminating against Ms. Lee regarding the terms, conditions, location, and privileges of her employment.

166. As a result of the defendants' foregoing adverse actions and the intolerable work environment they created, Ms. Lee was constructively discharged from her employment.

167. In further retaliation against Ms. Lee, NCDPI, CCS, Richard and Booth, individually and in concert with each other and their employees, blocked and refused to consider Ms. Lee's applications for other open positions in the school system, even though Ms. Lee was highly qualified for all of them. Defendants did so in violation of their own policies which provide, "All qualified applicants shall be considered for each vacant

position. When several applicants for the same position are equally qualified and suitable for the position, employees within the school system will be given priority."

168. The defendants' retaliatory acts constitute, individually and cumulatively, materially adverse actions.

169. As a direct result and foreseeable of the foregoing adverse actions, Ms. Lee was forced to resign from her employment with CCS and NCDPI and was thereby constructively discharged.

170. As a result of the defendants' retaliatory acts, Ms. Lee suffered and continues to suffer significant harms in an amount to be determined by a jury, including lost earnings and benefits, the deprivation of her right to pursue her professional calling, lost professional opportunities, lost earning capacity, irreparable reputational harm, emotional distress, suffering, humiliation, and other natural and foreseeable significant harms arising from the retaliatory acts alleged herein.

171. As a further result of the defendants' retaliatory acts, Ms. Lee is entitled to equitable relief, including the declaratory and injunctive relief set out below.

**Plaintiff Lee Has Exhausted EEOC Procedures**

172. On December 19, 2025, Plaintiff Lee filed a timely charge of discrimination and retaliation with the Equal Employment Opportunity Office in Raleigh, North Carolina. Ms. Lee's formal charge of discrimination is annexed hereto as **Exhibit 6**. Ms. Lee's formal charge of discrimination incorporated by reference the allegations of retaliation and discrimination alleged in the original complaint in this action. See, *id.* ¶ 5.

173. On January 13, 2026, the EEOC issued a Right to Sue Notice to Ms. Lee, authorizing Ms. Lee to assert the discrimination and retaliation claims she asserts in this action. A copy of the EEOC's Right to Sue letter is annexed hereto as **Exhibit 7**.

174. This amended complaint is filed within 90-days after the EEOC issued its Right to Sue Notice to Ms. Lee.

## FOURTH CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

*Cynthia Lee against NCDPI and CCS*

175. The foregoing allegations are incorporated by reference as though fully set forth here.

176. At all times relevant to this action, Ms. Lee was an employee of both CCS and NCDPI.

177. CCS and NCDPI constructively discharged of Ms. Lee for reasons that violate public policy and are injurious to or against the public good, as those phrases are used in *Coman v. Thomas Manufacturing Co*., 325 N.C. 172, 381 S.E.2d 445, 447 (1989) (authorizing a wrongful discharge claim in violation of public policy where termination was constructive); *Whitt v. Harris Teeter, Inc*., 598 S.E.2d 151 (N.C. App. 2004) (in the context of a wrongful termination claim, "a constructive discharge occurs . . . when an employer deliberately causes or allows the employee's working conditions to become 'so intolerable' that the employee is forced into an involuntary resignation"); *id*. ("a coerced resignation is tantamount to a discharge").

178. Ms. Lee was constructively discharged as the direct and intended result of the defendants' retaliatory acts against her, detailed above, which was intended to cause or allow

Ms. Lee's working conditions to become so intolerable that Ms. Lee was forced into an involuntary resignation.

179. Defendants' discharge of Ms. Lee was in violation of public policy because it was obtained through retaliatory acts against Ms. Lee because Ms. Lee discharged her "duty to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting . . . [a] violation of State or federal law, rule or regulation." This duty is codified at N.C. Gen. Stat § 126-84. Ms. Lee's NCDPI Complaint was just one example of such a report.

180. N.C. Gen. Stat § 126-85(a) makes it the policy of this State that "No head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment because the State employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, any activity described in G.S. 126-84" which includes the duty to report "a violation of State or federal law."

181. Further, N.C. Gen. Stat § 126-85(a1) makes it the policy of this State that "No State employee shall retaliate against another State employee because the employee . . . reports or is about to report, verbally or in writing, any activity described in G.S. 126-84" which includes the duty to report "a violation of State or federal law."

182. As a result of the defendants' wrongful discharge of Ms. Lee, Ms. Lee suffered and continues to suffer lost salary and wages, lost benefits, a deprivation of her right to pursue her professional calling, and lost professional opportunities, lost earning capacity, irreparable

reputational harm, emotional distress, suffering, humiliation, and other natural and foreseeable harms arising from the retaliatory acts alleged herein.

**FIFTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT**
**(42 U.S.C. § 1983)**

*Cynthia Lee against CCS and NCDPI and Defendants Richard and Booth in their individual and official capacities*

183. The foregoing allegations are incorporated by reference as though fully set forth here.

184. Defendants CCS, NCDPI, Richard and Booth are "persons" as that term is used in 42 U.S.C. § 1983, and, at all times relevant to this action, were acting under color of law.

185. Plaintiff Lee engaged in protected First Amendment activity by advocating for the rights of disabled students enrolled in CCS schools and against CCS's policy and practice of violating federal disability discrimination statutes as detailed above. This advocacy culminated with Plaintiff Lee filing her formal complaint of CCS's systemic violations of IDEA with NCDPI.

186. After Defendants became aware of Plaintiff's protected First Amendment activity, they took actions that adversely affected her First Amendment rights, including all of the defendants' adverse actions against Plaintiff Lee, detailed above, that culminated in Ms. Lee's constructive discharge. The Defendants' retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

187. There was a causal relationship between Plaintiff Lee's protected activity and the defendants' conduct. There was a close temporal proximity between Plaintiff Lee's First

Amendment activity and the Defendants' adverse actions. Within days of the time Defendants became aware of Plaintiff Lee's protected activity and the time Defendants began engaging in the adverse actions that culminated in Plaintiff Lee's constructive discharge. Moreover, Defendants expressly referred to Plaintiff Lee's protected activity (i.e., her "complaints") while they openly demeaned, disparaged and humiliated Plaintiff in front of her professional peers for objection to having made her complaints.

188. As a direct and foreseeable result of the Defendants' retaliation in violation of Plaintiff's First Amendment rights, Plaintiff suffered compensable harms including lost past and future salary, wages, and benefits, the deprivation of her right to pursue her professional calling; lost professional opportunities, lost earning capacity, irreparable reputational harm, emotional distress, suffering, humiliation, and other natural and foreseeable harms arising from the Defendants' retaliatory acts.

189. Therefore, as a result of the foregoing harms, Plaintiff Lee is entitled to compensatory damages against CCS in an amount to be determined by a jury and declaratory and prospective injunctive relief against both CCS and NCDPI.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF ARTICLE I, § 14 OF THE NORTH CAROLINA CONSTITUION**

*Cynthia Lee against CCS and NCDPI*

190. The foregoing allegations are incorporated by reference as though fully set forth here.

191. To the extent that Plaintiff Lee's state law remedies are inadequate to redress the harms caused by Defendants other violations of state law, Plaintiff Lee asserts this direct cause of action under the North Carolina Constitution.

192. Article I, Section 14 of the North Carolina Constitution provides, "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse."

193. The same facts giving rise to Plaintiff's Section 1983 First Amendment claim, above, establish a violation of Article I, Section 14 of the North Carolina.

## JURY TRIAL DEMAND

194. All plaintiffs hereby demand a trial by jury on all issues that may be so tried.

## VIII. PRAYER FOR RELIEF

### A. Prayer as to the Minor Plaintiffs and the Class

195. The Minor Plaintiffs, for themselves and on behalf of the Class, respectfully request that the court enter a final judgment awarding them the following relief:

a. An order requiring NCDPI and CCS to provide or to fund private compensatory education for all the educational services that were not afforded to the Minor Plaintiffs and the Class because of the violations alleged herein and established at trial;

b. An order requiring NCDPI and CCS to establish a compensatory education fund to finance the provision of compensatory education by private providers of specialized instruction and related services;

c. A final judgment awarding the Minor Plaintiffs and the Class Members compensatory damages in an amount sufficient to compensate them for the harms caused by NCDPI's and CCS's unlawful conduct in a per diem amount for each day that they were deprived of their federal rights.

d. A declaratory judgment declaring that NCDPI and CCS violated the federal and state law in the ways alleged herein, including the IDEA and Section 504 of the Rehabilitation Act.

e. An order directing NCDPI to implement a state-wide, pro-active enforcement protocol for ensuring compliance with corrective action plans ("CAP") that includes, but is not limited to, a determination of whether the CAP has resulted in providing an educational program more "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F. v. Douglas C'nty Sch. Dist*. RE-1, 137 S.Ct. 988, 1001 (2017);

f. An order requiring NCDPI and CCS to hire or allocate the appropriate, qualified staff to ensure that the CAP is monitored and enforced;

g. An order requiring NCDPI and CCS to engage in ongoing, proactive CAP monitoring that ensures compliance with the federal and state laws that they are found to have violated;

h. An order directing NCDPI to employ an independent monitor or ombudsperson for CCS and every other LEA in North Carolina to oversee ensures compliance with the federal and state laws that they are found to have violated;

i. An order directing NCDPI and CCS to demonstrate their full compliance with all Systemic Corrective Actions and Individual Corrective Actions ordered in NCDPI's Final Report on Ms. Lee's complaint; and

j. An order permanently enjoining CCS and NCDPI from using MTSS or any other RtI strategy to delay or deny children of their right to a free appropriate public education and directing defendants to codify and implement policies, procedures and protocols reasonably necessary to prevent a recurrence of the unlawful conduct alleged herein.

k. Award the Minor Plaintiffs and the Class Members the costs of this action and attorneys' fees to the extent allowed by law; and

l. All other and further relief, both legal and equitable, that the Court deems just and proper.

**B. Prayer as to Plaintiff Cynthia Lee's Causes of Action**

196. Plaintiff Cynthia Lee respectfully requests that the court enter a final judgment awarding her the following relief:

a. An order declaring CCS's retaliatory conduct unlawful;

b. An order enjoining CCS from engaging in further retaliatory actions against Ms. Lee;

c. A final judgement awarding Ms. Lee compensatory damages, back pay, front pay, and punitive damages in an amount to be determined by a jury;

d. An order directing CCS and NCDPI to reinstate Ms. Lee's employment at another CCS school or as the monitor and ombudsperson designated to enforce CCS's compliance with the laws;

e. An order awarding Plaintiff Lee the costs of this action and attorneys' fees to the extent allowed by law; and

f. All other and further relief, both legal and equitable, that the Court deems just and proper.

Respectfully submitted this 19th day of March 2025, by:

EKSTRAND & EKSTRAND, LLP
Attorneys for Plaintiffs

/s/ Robert C. Ekstrand
Robert C. Ekstrand
NC Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
Direct: (919) 452-4647
rce@ninthstreetlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| CYNTHIA LEE, et al., *Plaintiffs*, v. CUMBERLAND COUNTY BOARD OF EDUCATION, et al., *Defendants*. | 5:25-cv-00746-D-KS |

CERTIFICATE OF SERVICE

I certify that, on March 19, 2026, the foregoing First Amended Complaint was filed with the Court's CM/ECF System, which will issue a Notice of Electronic Filing (NEF) to counsel of record for every party, all of whom are registered to receive NEFs through the Court's CM/ECF System:

*Counsel for Defendants North Carolina Department of Public Instruction and Carol Ann Hudgens:*

**Todd Russell**
NC Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
919-716-0585
Email: trussell@ncdoj.gov

*Counsel for Cumberland County Board of Education, Ayanna Richard, and Shannon Booth:*

**Amie Carol Sivon**
Ragsdale Liggett PLLC
2840 Plaza Place, Suite 400
Raleigh, NC 27612
919-787-5200
Fax: 919-783-8991
Email: asivon@rl-law.com

**Edward Eugene Coleman , III**
Ragsdale Liggett PLLC
2840 Plaza Place, Suite 400

Raleigh, NC 27612
919-881-2203
Email: ecoleman@rl-law.com

**Mary M. Webb**
Ragsdale Liggett PLLC
2840 Plaza Place, Suite 400
Raleigh, NC 27612
919-787-5200
Fax: 919-783-8991
Email: mwebb@rl-law.com

/s/ Robert C. Ekstrand .
Robert C. Ekstrand